UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STUDENT R.A., et al.,

          Plaintiffs,

    v.

WEST CONTRA COSTA UNIFIED
SCHOOL DISTRICT,

          Defendant.

Case No.  14-cv-0931-PJH

**ORDER RE CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

      This is an appeal pursuant to the Individuals With Disabilities Education Act
("IDEA"), 20 U.S.C. § 1400, et seq., and California Education Code § 56505(k), of a
decision by an administrative law judge ("ALJ") in a "due process" proceeding before the
Special Education Division of the California Office of Administrative Hearings ("OAH").

      Plaintiffs are Student R.A., by and through his Guardian Ad Litem, Hagit Habash;
his mother, Hagit Habash; and his father, Odeh Habash.  Defendant is the West Contra
Costa Unified School District ("the District").  Both sides filed petitions with the OAH for a
due process hearing, and the ALJ ruled against plaintiffs and in favor of the District.

      The parties' cross-motions for summary judgment came on for hearing before this
court on June 10, 2015.  Plaintiffs appeared by their counsel Frances Kaminer, and the
District appeared by its counsel Kimberly Smith.  Having read the parties' papers and
carefully considered their arguments and the relevant legal authority, the court hereby
DENIES plaintiffs' motion and GRANTS the District's motion.

**THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT**

In enacting the IDEA, Congress sought to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living;" to "ensure that the rights of children with disabilities and parents of such children are protected;" and to "assist States, localities, educational service agencies, and Federal agencies to provide for the education of all children with disabilities[.]"  20 U.S.C. § 1400(d)(1)(A)-(C).

"To accomplish these objectives, the federal government provides funding to participating state and local educational agencies, which is contingent on the agency's compliance with the IDEA's procedural and substantive requirements."  Anchorage Sch. Dist. v. M.P., 689 F.3d 1047, 1053-54 (9th Cir. 2012); see also Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1469 (9th Cir.1993).  State statutes, and regulations enacted pursuant to those statutes, also apply in IDEA cases.  See Board of Educ. v. Rowley, 458 U.S. 176, 203 (1982); Union Sch. Dist. v. Smith, 15 F.3d 1519, 1524 (9th Cir. 1994).

The IDEA's primary goal of assuring that all disabled children have a "free appropriate public education," or "FAPE," that meets their unique educational needs, is achieved through the development of an individualized education program ("IEP") for each child with a disability.  See 20 U.S.C. § 1414; Ojai, 4 F.3d at 1469.  The IEP is crafted by an "IEP Team" that includes a student's parents and teachers, representatives from the local educational agency, and where appropriate, the student.  20 U.S.C. § 1414(d)(1)(B).  The IEP must include various items, such as "a statement of the child's present levels of academic achievement and functional performance," "a statement of measurable annual goals, including academic and functional goals," and "a description of how the child's progress toward meeting the annual goals . . . will be measured."  Id. § 1414(d)(1)(A).  Local educational agencies must review, and where appropriate revise, each student's IEP at least annually.  See id. § 1414(d)(4)(A).

To meet the continuing duty to develop and maintain an appropriate IEP, the

United States District Court
Northern District of California

2

school district must assess or reassess the educational needs of the disabled child.  Id. § 1414(a), (b); Cal. Educ. Code §§ 56320, 56321.  The school district must conduct a reassessment of the special education student not more than once a year, but at least once every three years.  20 U.S.C. § 1414(a)(2)(B); Cal. Educ. Code § 56381(a)(2).  The district must also conduct a reassessment if the district "determines that the educational or related service needs, including improved academic achievement and functional performance, of the child warrant a reevaluation."  20 U.S.C. § 1414(a)(2)(A)(i); see also Cal. Educ. Code § 56381(a).

A reassessment requires parental consent.  20 U.S.C. § 1414(c)(3); Cal. Educ. Code § 56321(c), § 56381(f).  A school district must develop and propose a reassessment plan.  20 U.S.C. § 1414(b)(1); Cal. Educ. Code §§ 56321(a), 56381(f).  If the parents do not consent to the plan, the district can conduct the reassessment only by showing at a due process hearing that it needs to reassess the student and is lawfully entitled to do so.  20 U.S.C. § 1414(a)(1)(D); 34 C.F.R. § 300.300(c) (2008); Cal. Educ. Code § 26321(c), § 26381(f), § 56501(a)(3), § 56506(e).  However, a parent who wishes that his/her child receive special education services under the IDEA must allow reassessment if conditions warrant.  Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1315 (9th Cir. 1987).

The IDEA also incorporates extensive procedural safeguards for the benefit of the disabled child and his/her parents, including the opportunity to review records; the right to be notified of any changes in identification, evaluation, and placement of the student; and the right to file a due process complaint regarding their child's education.  See 20 U.S.C. § 1415(b)-(h).  Such complaints may lead to mediation or an appearance at an impartial due process hearing conducted by a hearing officer.  See id. at § 1415(e)-(f); see also Anchorage, 689 F.3d at 1054.

Due process hearings are limited to "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."  20 U.S.C. § 1415(b)(6)(A).  In California, due process

United States District Court
Northern District of California

1    hearings are conducted by the OAH, a state agency independent of the Department of

2    Education.  M.M. v. Lafayette Sch. Dist., 681 F.3d 1082, 1085, 1092 (9th Cir.2012).  A

3    party dissatisfied with the outcome of a due process hearing may obtain further review by

4    filing a civil action in state or federal court.  20 U.S.C. § 1415(i)(2)(A).

5        The IDEA does not require school districts to give special education students the

6    best education available or to provide services and instruction to maximize their potential;

7    rather, it requires only that school districts provide a "basic floor of opportunity that

8    includes access to specialized instruction and services that are individually designed for

9    the student and provide educational benefit."  Rowley, 458 U.S. at 198-201, quoted in

10   Anchorage, 689 F.3d at 1057-58.  As long as a school district provides a student with a

11   FAPE, it can select the methodology for its program and services.  Id. at 208.  Thus, if a

12   district's program is designed to meet a student's unique needs, provide some

13   educational benefit, and comport with the IEP, and if it is offered in the least restrictive

14   environment, the district should be found to have offered a FAPE, even if the parents'

15   preferred programs may have resulted in greater benefit.  Id. at 207-08; Gregory K., 811

16   F.2d at 1314.

## FACTUAL AND PROCEDURAL BACKGROUND

18       Student R.A. ("Student"), who is currently 13 years of age, resides within the

19   District.  He has received a diagnosis of autism spectrum disorder, and was found eligible

20   for special education services in 2005.  Administrative Record ("AR") 1329, 1601.

21   Student's IQ is above average, but because of his disability, he suffers several-year

22   development delays in social skills, verbal skills, and academics.  AR 1329-1368, 1601.

23   Over the years, his educational program has included services in the areas of applied

24   behavioral analysis ("ABA"), speech and language ("SL"), socialization, and occupational

25   therapy ("OT"), due to his unique needs.  AR 1601.  His last triennial assessment prior to

26   the events related here was in 2008.  AR 1809-10, 3186.

27       In May 2010, Student's parents ("Parents") and the District resolved a dispute over

28   Student's education by entering into a Final Settlement Agreement and Release (the

"Settlement Agreement."). AR 862-75. Pursuant to the terms of the Settlement Agreement, the District agreed to fund a home-based program of services approved by Parents, for the 2010-2011, 2011-2012 and 2012-2013 school years, during which time District staff would not assess or provide direct services to Student. AR 862-75, 3969.

Since the time of the May 2010 Settlement Agreement, Student has not attended any of the District's schools. AR 1601. He has received all his educational instruction and services through the in-home program funded by the District. AR 1601. In this program, he has been schooled using a program that was developed and supervised by his mother ("Mother" or "Dr. Habash"). AR 1601, AR 3170-73. Plaintiffs allege that this program employed ABA techniques 100% of the time and was implemented one-on-one by a credentialed ABA-trained certified teacher chosen by Dr. Habash. See Cplt ¶ 15; see also AR 1601.

The Settlement Agreement provided that the District was to complete a triennial reevaluation of Student in spring 2013, to determine his special education needs for the following school year, and that the assessment plan would include (but not be limited to) a psychoeducational assessment and behavioral assessment. AR 871. The District also agreed to contract for and fund an SL (including social skills) evaluation and an OT assessment, "to be conducted by the District's choice of NPA [nonpublic agency] provider." AR 871, 1601-02.

Parents agreed that their signature to the Settlement Agreement constituted "consent for the District's conduction of [the] evaluations, including contracting for and funding the NPA evaluation," and that "[n]o other assessment plan shall be required." AR 871, 1602. They further agreed to "make Student available for these assessments in his current educational placement and a District site, including, but not limited to, observation of Student." AR 871, 1602. At the conclusion of the assessment process an IEP meeting was to take place as required under the IDEA, and the District was to make an offer of services and school placement. The District agreed to convene the triennial review/annual IEP Team meeting on or before May 1, 2013. AR 871, 1602.

On November 15, 2012, Steven Collins, Director of the District's Special Education Local Plan Area ("SELPA"), sent Parents a letter and an Assessment Plan, notifying them of Student's upcoming triennial reevaluation.  AR 878, 1281-82.  The Assessment Plan noted the specific areas to be evaluated, including academic achievement, health, intellectual development, language/speech communication development, motor development, social/emotional development, adaptive/behavior development, and processing skills, and also provided the title of the examiner proposed for each area.  AR 878, 1282.

The Assessment Plan indicated that Student's language/speech communication development would be evaluated by the Speech and Language Pathologist as well as by the School Psychologist.  AR 878, 1282.  The School Psychologist would be involved in assessing Student in all identified assessment areas, with the exception of the health assessment, which would be done solely by the District's nurse.  AR 878, 1282.  Specifically, as reflected in the Settlement Agreement, Student's social skills functioning would be evaluated through the SL assessment and the District's psychoeducational assessment.  AR 1602.

The letter also included a Notice of Reassessment (Three-Year Routine Reevaluation), a parent rating scale and developmental and social history form to be completed by Parents, and a copy of the Procedural Safeguards.  AR 877, 1283-1300.

Mr. Collins requested that Parents sign and return the Assessment Plan, so their consent could be provided to the assessors.  AR 1281.  Parents did not sign and return the Assessment Plan as requested.  Instead, on November 17, 2012, Dr. Habash e-mailed Mr. Collins, stating that she and Student's father would "abide by the settlement agreement" and would make Student "available to be assessed by District chosen professionals in spring 2013."  AR 879, 1492, 3400.

On January 9, 2013, Dr. April Jourdan, the District School Psychologist assigned to conduct the psychoeducational and behavioral portions of Student's triennial reevaluation, telephoned Dr. Habash to schedule Student's assessments.  AR 891, 1545,

1    1697, 1700, 1716.  Dr. Jourdan is highly qualified and experienced in conducting triennial

2    assessments.  AR 1567-68.  She holds a B.S. in psychology, an M.A. in counseling, a

3    Ph.D. in counseling and human development, and a Pupil Personnel Services Credential

4    in school psychology and school counseling, and is a diplomat of the American Board of

5    School-Neuropsychology, a board certified behavior analyst, and a licensed educational

6    psychologist.  AR 1567, 1782-83.

7         Dr. Jourdan has completed specific training in social communication, emotional

8    regulation, transactional support (SCERTS) model, verbal behavior milestones

9    assessment and placement program (VB-MAPP), treatment and education of autistic and

10   related communication handicapped children (TEACCH), and autism diagnostic

11   observation schedule (ADOS) among others.  AR 1567, 1783-84.  She has also conducted

12   approximately 400 psychoeducational evaluations, approximately half of which were

13   evaluations of students with autism, as well as hundreds of behavioral evaluations,

14   including of students with autism.  AR 1784, 1789.  She was familiar with Student, as she

15   had completed an autism assessment of him in 2008.  AR 1698-99; 1809-10.

16        Dr. Habash and Dr. Jourdan exchanged e-mails on January 9 and 10, 2013,

17   regarding potential dates to begin the assessment, the location of the assessment, the

18   assessments that might be used on the first day of testing, and whether Dr. Habash could

19   observe the assessment.  AR 891-95, 1545, 1548-49.  In one of her initial e-mails to Dr.

20   Jourdan on January 9, 2013, Dr. Habash asked where the testing would be conducted and

21   what tests would be administered, and stated, "I request to be in attendance while testing

22   is taking place."  AR 1549-50.  Dr. Jourdan responded, "Although you can wait outside of

23   the room where I will be testing [R.A.], you cannot be present during the testing.  Our

24   standard procedure is to have parents wait outside of the testing room."  AR 1549.  In

25   response, Dr. Habash stated, "I will be willing to wait outside as long as you use a one-

26   sided mirrored room, where I can observe (and hear) my child being tested.  Please let me

27   know when you find such an arrangement in proximity to our hometown."  AR 1549.

28        The following day, January 10, 2013, Dr. Habash stated in another e-mail, "It is my

United States District Court
Northern District of California

1   intent to participate in my child's testing, without interfering with the testing process itself,"

2   and repeated her request that the testing be conducted in a room with a one-way mirror

3   that would allow her to both see and hear the testing.  AR 895, 1548.  In response, Dr.

4   Jourdan offered to conduct the testing at Cameron School where Dr. Habash could

5   observe through a window but would not be able to hear the assessment.  AR 894.  Dr.

6   Habash did not accept this offer, and in another email to Dr. Jourdan on January 10,

7   2013, reiterated the request to both see and hear the assessment.  AR 895, 1548.

8           On January 14, 2013, Mr. Collins sent Dr. Habash a letter explaining that the

9   District would not grant her request as her presence would alter the testing environment

10   and affect the accuracy of test results.  AR 880.  He stated that

12          [t]esting at a District site is, in part, to see how [Student] functions in a
        District setting with District staff, which does not include the parent.
13          Testing is between the assessor and the child.  Your presence watching
        and listening to testing sessions would alter the testing environment and
14          affect the accuracy of test results.  The District does not agree to limitations
        on its assessment of [Student].  However, in an effort to be collaborative,
15          the District offered to assess [Student] at Cameron School, where it is
        possible to visually observe the testing sessions.

16   AR 880, 3791.

17           Dr. Habash sent a letter to Mr. Collins on January 16, 2013, again requesting to

18   fully observe (see and hear) the assessment, but not responding to the Cameron School

19   offer.  AR 881-83,1494-96.  Dr. Habash stated that she feared the District had

20   misunderstood her request, asserting that she had not requested to be inside the testing

21   room, had not requested to alter the testing environment, and had not requested to affect

22   the accuracy of the testing, but rather had simply requested to be present, outside the

23   testing room, but in a position to see and hear everything that was happening inside the

24   testing room via a one-way mirror through which Student could not see her observing the

25   testing.  AR 883.  She claimed that she was not denying the District's request to assess

26   Student, but was simply requesting to observe the testing in a way that would not

27   interfere with it.  AR 883.  She stated that in past assessments outside of the District she

28   had always been permitted to observe the testing through a one-way mirror.  AR 883.

1    In response, the District reiterated its Cameron School offer in an e-mail dated

2  January 24, 2013.  AR 1497.  The parties continued to exchange e-mails over the next

3  two weeks.  Dr. Habash continued to ignore the District's offer, and to insist that she be

4  permitted to both see and hear the assessment.  AR 1499-1502.  On February 8, 2013,

5  she stated in an e-mail to Mr. Collins,

> It is my understanding that the District is denying Parent full observation
> (i.e., watching and listening) of the psychoeducational assessment, the
> District is offering to be done by the District's school psychologist. . . . As the
> District is aware of, I have not requested to be present in the testing room,
> but only outside, observing through a one-way mirror.  The District would
> not answer my question for whether it has such a room on its premises that
> is available for testing.

10  AR 1504.

11    In the same e-mail, Dr. Habash stated, "I wish to add a social cognitive

12  assessment, in addition to the other assessments the District assessors already

13  contacted Parent for, in order to cover this area of major deficit."  AR 1504.  In addition,

14  she requested an explanation for the District's request for an IQ test, claiming that an IQ

15  test was unwarranted because "my child has no diagnosis of mental retardation."  AR

16  1504-05.

17    On February 11, 2013, Mr. Collins again extended the Cameron School offer by

18  letter and e-mail.  AR 884-85, 1301-02, 1506.  In the letter, Mr. Collins reminded Dr.

19  Habash that the assessment was being conducted pursuant to the terms of the May 25,

20  2010 Settlement Agreement, and that pursuant to that Agreement, the District was

21  entitled to conduct a psychoeducational and behavior evaluation of Student, and also to

22  select and fund SL and OT assessments by NPA providers.  AR 884, 1301.

23    Mr. Collins noted that the Settlement Agreement provided that the Agreement itself

24  constituted consent for the District to conduct those assessments, and that the family had

25  agreed to make Student available for those assessments in his current educational

26  placement and at a District site.  AR 884, 1301.  He stated that the District was entitled to

27  conduct its triennial assessment of Student using the assessments and methods that the

28  assessors, in their professional opinion, believed to be appropriate.  AR 884, 1301.  He

9

stated that the District would not accept additional conditions on the evaluation process, and added that if Dr. Habash were dissatisfied with the assessments after they were completed, she could at that time exercise her rights as delineated in the Notice of Procedural Safeguards and Parents' Rights.  AR 884, 1301.

Mr. Collins stated further that the District was not willing to amend the Settlement Agreement to include a social cognitive assessment, as it believed the assessments described in the Agreement were sufficient to provide the IEP team with the information required to develop an appropriate program for Student.  AR 885, 1302.  He reiterated that if Dr. Habash disagreed with the assessments or results after they were completed and presented to Student's IEP team, she could exercise her Parent's rights at that time, but added that the District was under no obligation to provide her with an explanation for every test or assessment procedure the District assessors chose to use.  AR 885, 1302.

Mr. Collins emphasized that Dr. Habash watching and listening could alter the testing environment and affect the accuracy of test results.  AR 1506.  Mr. Collins then stated that if Dr. Habash did not contact Dr. Jourdan by February 15, 2013, to set up the remainder of Student's testing schedule, the District would assume that Dr. Habash did not intend to allow the District to conduct any further assessments of Student.  AR 1506.

In response, Dr. Habash did not comment on the District's explanation as to why she could not be present for the assessment, but instead simply repeated her request that the testing occur in a room with a one-way mirror with sound where she could see and hear the testing take place.  AR 1507.  Dr. Habash subsequently admitted she did not contact Dr. Jourdan as requested.  AR 3449.

Almost four weeks later, on March 9, 2013, Dr. Habash returned the BASC II rating scale[1] provided to her by Dr. Jourdan.  AR 1534.  Dr. Jourdan responded by offering to schedule a time to complete the psychoeducational and behavioral

_____

[1]  The BASC II rating scale is a tool used in the behavioral and emotional assessment of a child.  AR 1724-25.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    assessments.  AR 1534.  Dr. Habash stated that she would refrain from discussion at that

2    time and directed Dr. Jourdan to contact her employer as the parties were in due

3    process.  AR 1534.  Dr. Jourdan interpreted this response to mean that Dr. Habash

4    would no longer communicate with her and would not make Student available for

5    assessment.  AR 1853-54; see also AR 1892-95.

6         However, Dr. Habash contacted the District again on March 18 and 20, 2013,

7    reiterating her request that the District assess Student in a room where she could both

8    see and hear the testing.  AR 886, 1511-12.  Mr. Collins once again responded offering

9    the Cameron School option and requesting that Dr. Habash contact Dr. Jourdan to

10   schedule the assessment.  AR 1511.

11        On April 18 and 19, 2013, Dr. Habash forwarded progress and assessment reports

12   prepared by herself and Student's home-school teacher, consisting of over 800 pages, to

13   Mr. Collins.  AR 1611, 3299, 3825, 3828.  Mr. Collins printed the reports and provided

14   them to Ora Anderson, the District's Director of Special Education, for consideration by

15   the IEP Team.  AR 3828, 3961, 3975-76.  Just prior to the IEP meeting on April 24, 2013,

16   Dr. Habash also forwarded to Ms. Anderson proposed English language arts and applied

17   math goals she wished to have incorporated into the IEP.  AR 1523.

18        Student's annual and triennial IEP Team meeting was convened by the District on

19   April 24, 2013, and was concluded on May 21, 2013.  The purpose of the meeting was to

20   comply with the Settlement Agreement and to ensure that Student had an IEP in place at

21   the start of the 2013-2014 school year.  AR 1329-1368, 3973.  Ms. Anderson was the

22   administrative designee for the two IEP meeting sessions.  AR 3971.  As the

23   administrative designee, Ms. Anderson was part of the IEP Team, helped make decisions

24   about program services and placement, facilitated the scheduling of meetings, and sent

25   out meeting notices.  AR 3972.

26        The April 24, 2013, meeting lasted two or three hours.  AR 2973, 3395, 3715,

27   3979-80.  In addition to Ms. Anderson and Dr. Habash, the meeting was attended by

28   Barbara McIntyre (General Education Teacher), Cathy Sanchez-Corea (Special

United States District Court
Northern District of California

1  Education/Full Inclusion Teacher), Dr. April Jourdan (District School Psychologist and

2  Behaviorist), Jennifer Marie Ogar (Speech and Language Pathologist), Rosalind Brown

3  (District Special Education Program Specialist), Shannon J. Riehle (Student's home

4  school teacher), and Marion McLean (neutral facilitator).  AR 1337-1338, 1610, 2972-73,

5  3621, 3973, 3980-82, 4262.  Elizabeth Bianchi Isono (Occupational Therapist), who had

6  conducted the OT assessment of Student, was not present at the April 24, 2013 meeting

7  because of a scheduling conflict.  AR 3607-08. 3982-83.

8        The psychoeducational and behavioral assessments were never completed due to

9  Parents' refusal to make Student available for those assessments, and only the SL and

10  OT evaluations were complete at the time of the April 24, 2013 meeting.  AR 1336, 1890-

11  91, 1902, 3974-75.  While the members of the IEP Team reviewed Ms. Ogar's SL

12  evaluation and discussed goals, they did not review the OT report, as Ms. Isono was not

13  present at the meeting.  After the SL discussion, Ms. Anderson suggested that the

14  meeting participants take a break to review Dr. Habash's reports before they were

15  presented since the full IEP Team had not had a chance to review them.  AR 1337, 3990.

16  Dr. Habash was not agreeable to this suggestion.  AR 3990-91.  Instead, Dr. Habash and

17  Ms. Riehle immediately presented information from the reports to the Team.  AR 1337,

18  1902, 2973, 3297-98, 3991.

19        Dr. Habash actively participated in the IEP meeting process.  AR 1337-1338,

20  1920, 2973, 3622, 3983.  In addition to discussing the hundreds of pages of data she had

21  provided, she asked questions, provided input, and expressed her concerns about

22  Student's  assessments.  AR 1336-37, 1920-21, 3622, 3983.  Her input and reports were

23  also discussed and considered by the Team.  AR 1336-37, 1906-07, 3983, 4265.  A

24  follow-up Team meeting was scheduled to discuss any further questions regarding the

25  proposed SL goals, to allow the team sufficient time to read the Parent reports and

26  proposals, to discuss the OT report with Ms. Isono (who had been unable to attend the

27  April 24, 2013 meeting), and to complete the IEP process.  AR 1337, 3720-21, 3991-92.

28        The follow-up meeting was originally scheduled for May 9, 2013.  AR 3992.  On

12

1   May 4, 2013, Dr. Habash sent an e-mail asking Ms. Anderson and Mr. Collins to explain

2   "the purpose of the IEP you have requested for May 9, 2013," and telling them to send

3   her "the agenda of the proposed meeting" by Monday, May 6, 2013.  AR 1525.  On May

4   8, 2013, Dr. Habash informed the District that she would be unable to attend the IEP

5   Team meeting, and stating that she would not give permission for the District to hold the

6   meeting in her absence.  AR 1526-27, 3996.  The meeting was rescheduled to May 21,

7   2013.  AR 1527, 3996.

8        On May 17, 2013, Dr. Habash sent yet another e-mail in which she asserted that

9   the District had "decided not to assess" Student, and that it had not answered her

10   "repeated offer to assess" Student before the upcoming IEP.  AR 1513.  In response, Mr.

11   Collins sent a letter on May 20, 2013, in which he emphasized that the District had been

12   attempting to complete the psychoeducational and behavior assessments since January

13   2013 and had consistently offered to conduct the assessments at Cameron School, but

14   that Dr. Habash had refused the offer because of her insistence that she be permitted to

15   hear the assessments as well.  AR 1377.  Mr. Collins again explained that the conditions

16   Dr. Habash sought to impose were not acceptable as they could alter the testing

17   environment and affect the validity of the test results.  AR 1378.  Dr. Habash responded

18   to the letter via a brief e-mail on May 20, 2013, stating that she disagreed with the District

19   and claiming that the District had decided not to complete the assessments, after her

20   "repeated offers to avail [Student] for completion of the assessments."  AR 1514.

21        Prior to the May 21, 2013 continuation meeting, Ms. Anderson sent the members

22   of the IEP Team, including Dr. Habash, a copy of the agenda and the draft goals that

23   would be presented.  AR 1528-30.  The May 21, 2013, Team meeting lasted three or four

24   hours.  AR 3317, 3628.  During the meeting, Dr. Habash presented additional information

25   regarding Student's home-school program.  AR 1338-39, 1902, 4014-15.  The IEP Team

26   then discussed the District's proposed goals and objectives in which the goals were

27   reviewed and input was received by various Team members, including Dr. Habash.  AR

28   1338-39, 3317, 3627, 4017, 4297.

United States District Court
Northern District of California

1    The meeting participants also discussed a variety of placement options for

2  Student.  AR 1338-39, 4021, 4304-05, 4307.  These options included a District full-

3  inclusion program; placement in a District special day class; continuation of the home-

4  based program; 1:1 instruction on a public school site with access to "ABA-trained typical

5  peers" for social thinking and "lunch bunch" as requested by Parents; Star Academy, a

6  nonpublic school; and Anova Center for Education ("Anova") School, another nonpublic

7  school.  AR 1338-40, 1915-17, 3640, 4022-27, 4304-07.  The discussion regarding

8  placement options and services lasted between sixty and ninety minutes and all

9  members of the IEP Team participated, although Dr. Habash insisted that Ms. Anderson

10  speak last.  AR 1338-39, 3331, 3484-86, 3626, 4021-23, 4305, 4353-54.

11    When it was her turn to provide input regarding a possible placement, Ms.

12  Anderson expressed concerns about Student's ability to transition directly from an

13  isolated home program to a public school setting, and she suggested Anova because,

14  after considering the information from Parents and the IEP team members, she believed

15  it would best suit Student's needs.  AR 1339-40, 4026-28.  Ms. Anderson testified that

16  she had contacted Anova in January or February 2013 to collect general information

17  about the school regarding its enrollment process, the type of student it works with, and

18  what services it offers, as the District had several students that it was considering for

19  placement there.  AR 4028-30.

20    Anova is a certified non-public school designed to serve students who are living

21  with autism, ADHD-specific learning disabilities, speech and language impairments, and

22  other disabling conditions recognized by the state of California in a setting that is

23  primarily academic in nature.  AR 2609.  The middle school program at the Anova

24  Concord campus where Student would be enrolled would have between 8-10 students,

25  and Student would be provided with both individual and small-group instruction, as

26  needed. AR 1627.

27    Andrew Bailey, Anova's founder and Executive Director, testified at the due

28  process hearing that Anova's student population comprises approximately 70 per cent

14

autistic students, and about 30 per cent students with learning disabilities, speech and language impairment, attention deficit hyperactive disorder, and other disorders.  AR 2611.  He also testified that of the students on the autistic spectrum, all are high-functioning, "if not Asberger's" (a diagnosis he stated no longer exists under the DSM-5).  AR 2612.

Ms. Anderson recommended placement in a nonpublic school environment, and Anova in particular, because the program is in a small, controlled setting; all staff are trained in ABA methods, which were being utilized with Student in his home program; Student would be with same age peers, both neurotypical and other students with varying degrees of autism, throughout the school day; the program has a strong social skills component; the program can be individualized to meet a particular student's needs; related services are available on site; and the program has a strong academic component.  AR 1440-41, 2609, 2611, 2640, 4026, 4033-4037.

At the due process hearing, Mr. Bailey reviewed the IEP developed during the April 24, and May 21, 2013 IEP Team meeting and concluded the that goals, program and placement described could be appropriately implemented at Anova.  AR 2607.  Also at the due process hearing, various Team members concurred that Anova would be an appropriate placement for Student, particularly as a transitional placement between his home-based program and eventual placement in a public school program.  AR 1918 (Dr. Jourdan), 3672 (Ms. Ogar), 4040 (Ms. Anderson), 4315, 4343 (Ms. Brown).  Some Team members also expressed concerns that the transition from a home-based program to a full inclusion program, in which Student would be in general education for the length of the school day or different type of classroom on a public middle school campus, would be too difficult considering his sensitivity to noise and lack of familiarity with a school setting for several years.  AR 1919 (Dr. Jourdan), 3729-32 (Ms. Ogar), 4138 (Ms. Anderson), 4315 (Ms. Brown).

Team members testified that they considered the programs being recommended by Ms. Riehle – continuation of the home-based program – and Dr. Habash – a one-on-

United States District Court
Northern District of California

1   one program in a separate classroom on a public school campus with an ABA-trained

2   teacher and interaction with ABA-trained peer mentors for approximately one hour per

3   day – were too restrictive for Student.  AR 1918-19 (Dr. Jourdan), 3645-46 (Ms. Ogar),

4   4111 (Ms. Anderson), 4318-19 (Ms. Brown).  Some expressed concern that Student

5   required on-going, direct interaction with peers, which could not be achieved in a one-on-

6   one setting either at home or in a separate classroom on a public school campus.  AR

7   1339 (IEP Meeting Notes), 1918-19 (Dr. Jourdan), 3645-46 (Ms. Ogar), 4111 (Ms.

8   Anderson), 4318-19 (Ms. Brown).

9          Based on the discussion at the IEP Team meeting, which included a review of

10  multiple placement options by all members of the IEP team, the District offered

11  placement at Anova.  AR 1329-30, 4026.  The District concluded that Anova appeared to

12  be the best school for addressing the concerns of the IEP Team and Parents regarding

13  Student's social skills and need to socialize, and because it had staff trained in ABA

14  methods.  AR 4026-27.  The District also offered individual SL therapy for 30 minutes,

15  two times per week; OT consultation for 60 minutes monthly; and special education

16  transportation.  AR 1329-30.

17         Parents did not agree that Anova was an appropriate placement for Student.  AR

18  1340, 1367-68.  According to an e-mail dated June 5, 2013, Dr. Habash requested on

19  May 31, 2013 that she be provided with a guided tour of Anova.  AR 1515.  The District

20  arranged for her to visit Anova on June 20, 2013, but on June 10, 2013, before the

21  scheduled visit, she sent Mr. Collins an e-mail stating that she had "talked to Anova" that

22  day, and "realized that their ACE School does not fit my child's needs."  AR 1516.  Thus,

23  she requested that the District cancel the upcoming visit.  AR 1516.  However, she

24  continued to send e-mails to Mr. Collins with questions regarding transportation (for

25  Student) to Anova, and regarding Anova's student composition.  AR 1517-10, 1521-22.

26  She also sent e-mails to Mr. Bailey at Anova in which she asked questions about the

27  program.  AR 2680-81.

28         Mr. Collins sent Dr. Habash an e-mail on July 13, 2013, again offering to arrange

for a visit to Anova so that she could obtain answers to her questions by observing the program and speaking with staff.  AR 1521.  Dr. Bailey testified that Parents did eventually visit the school, in July 2013, at which time they asked questions of Mr. Bailey and looked at the classrooms, and Mr. Bailey explained the next steps in the referral and intake process.  AR  2680-82.

Parents ultimately rejected the District's May 21, 2103, placement offer and have not consented to any part of the IEP.   Parents filed a due process complaint on behalf of Student on March 27, 2013, and the District filed two due process complaints, on April 9, 2013, and June 17, 2013.  All three cases were consolidated on June 29, 2013.  An open due process hearing was held before ALJ Adeniyi A. Ayoade of the OAH, over 12 days in September-October 2013.

Parents and Student argued that the District denied Student a FAPE by failing to complete the triennial assessments that it had previously agreed to conduct pursuant to the May 2010 settlement agreement between the parties, and thus failing to have or write "measurable present levels of performance" and "appropriate goals" in his triennial IEP. Parents and Student argued further that the District denied Student a FAPE by offering him a placement that was not the least restrictive environment, because he could benefit from a full-inclusion program in a public school setting, and because Anova, the placement offered by the District, had no typically developing peers.  Finally, Parents and Student asserted that in failing to consider the recommendations of Dr. Habash and Ms. Riehle, and failing to sufficiently discuss the placement offer at the IEP Team meetings, the District predetermined Student's placement, thereby denying him a FAPE.  AR 1600.

The District argued that it had been unable to complete the triennial psychoeducational and behavior assessments of Student because Parents had insisted that Mother be allowed to both see and hear the assessments.  The District asserted that it was entitled to complete the assessments of Student without any conditions or restrictions, and that Student was not entitled to independent evaluations in the areas of social skills and speech and language, at public expense, because it had not been

17

1    allowed to complete its triennial reassessment of Student, and because its SL

2    assessment of Student was appropriate.  The District argued that its IEP placement was

3    the least restrictive environment, as it was designed to meet and address Student's

4    unique needs and provide educational benefit, based on the information available

5    regarding Student at the time the IEP was developed.  The District asserted that there

6    was no evidence the offer was predetermined, and that it had complied with all relevant

7    laws, substantively and procedurally, and that Parents were allowed to provide input and

8    meaningfully participate in the IEP development process prior to the District's making the

9    offer.  AR 1600.

10       On December 2, 2013, the ALJ issued a written decision, finding in the District's

11   favor, and against Student, on all issues.  AR 1597-1643.  The ALJ ordered Parents to

12   make Student available, within 30 days of the date of the decision, for the

13   psychoeducational and behavior assessments pursuant to the May 2010 Settlement

14   Agreement or the November 15, 2012 Assessment Plan.  AR 1642.  The ALJ further

15   ordered the District to complete its assessments of Student and to hold an IEP team

16   meeting within 60 days of the date of the order.  AR 1643.  The ALJ directed that at the

17   IEP, the District must review the results of the assessments, and make all appropriate

18   revisions to the Student's IEP, including placement and services.  AR 1643.  Finally, the

19   ALJ ordered that if Parents failed to present Student for the assessments as ordered, the

20   District would have no further obligation to provide a FAPE for Student.  AR 1643.

21       Plaintiffs did not make Student available, and the District was unable to complete

22   the assessments.  Plaintiffs filed the present action on February 28, 2014.  Each side

23   now seeks summary judgment.

**DISCUSSION**

24

25   A.    Legal Standard

26       The IDEA provides that "[a]ny party aggrieved by the findings and decision"

27   reached through the state administrative hearing process "shall have the right to bring a

28   civil action with respect to the complaint . . . in a district court of the United States."  20

United States District Court
Northern District of California

U.S.C. § 1415(i)(2).  A challenge under the IDEA may be procedural or substantive, or both.  J.W. v. Fresno Unified Sch. Dist., 626 F.3d 431, 432-33 (9th Cir. 2010).  When analyzing whether a school district provided a student a FAPE, the court must first consider "whether the State complied with the procedures set forth in the Act."  Doug C., 720 F.3d at 1043; see also J.W., 626 F. 3d at 432.  Second, the court must determine "whether the IEP is reasonably calculated to enable the child to receive educational benefits."  Doug C., 720 F.3d at 1043; see also J.W., 626 F.3d at 432-33.  A state must meet both requirements to comply with the obligations of the IDEA.  Doug C., 720 F.3d at 1043; see also R.B., 496 F.3d at  938 (reviewing court considers a school district's procedural compliance with the IDEA before reaching the IEP's substance).

While the petitioning party bears the burden of proof at the administrative level, Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 57 (2005), the party challenging an administrative decision in federal district court has the burden of persuasion on his or her claim, J.W., 626 F.3d at 438 (citing Clyde K. v. Puyallup Sch. Dist., No. 3, 35 F.3d 1396 (9th Cir. 1994)).  In such actions, the court receives the administrative record, hears any additional evidence, and issues a decision based on the preponderance of the evidence. J.W., 626 F.3d at 438 (citing R.B. v. Napa Valley Unified Sch. Dist., 496 F.3d 932, 937 (9th Cir. 2007)).  "[C]omplete de novo review of the administrative proceeding is inappropriate."  Van Duyn v. Baker Sch. Dist. 5J, 502 F.3d 811, 817 (9th Cir. 2007).

In exercising its power of independent review, the court should give "due weight" to judgments of educational policy, and should not substitute its own notions of sound educational policy for those of the school authority which it reviews.  Deference to an administrative officer is appropriate in matters arising under the IDEA "for the same reasons that it makes sense in the review of any other agency action – agency expertise, the decision of the political branches to vest the decision initially in an agency, and the costs imposed on all parties of having still another person redecide the matter from scratch."  Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 891 (9th Cir.1995) (quoting Kerkam v. McKenzie, 862 F.2d 884, 887 (D.C. Cir. 1988)).

United States District Court
Northern District of California

However, "judicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." Ojai, 4 F.3d at 1471.  In IDEA cases, courts give "less deference than is conventional" in the review of administrative decisions. Id. at 1472.  However, "[t]he amount of deference accorded the hearing officer's findings increases where they are 'thorough and careful.'" Capistrano, 59 F.3d at 891; see Anchorage, 689 F.3d at 1053.  Where the administrative record shows that the hearing officer's findings are supported by a preponderance of the evidence, "the court is free to accept or reject the findings in part or in whole." Gregory K., 811 F.2d at 1311 (citation omitted), quoted in Ojai, 4 F.3d at 1474; see also Ash v. Lake Oswego Sch. Dist., 980 F.2d 585, 587-88 (9th Cir. 1992).

In the present case, the court finds that the ALJ's decision was comprehensive and thorough.  The court has independently reviewed the evidence and confirmed the ALJ's references to the record, and gives considerable deference to his factual determinations. See Capistrano, 59 F.3d at 891.

B.      The Parties' Motions

Plaintiffs argue that the District denied Student a FAPE by failing to complete the psychoeducational and behavioral assessments it agreed to in the May 2010 Settlement Agreement; by failing to offer placement in the least-restrictive environment in the April 24, 2013 and May 21, 2013 IEP; and by predetermining Student's placement and failing to consider the recommendations of his IEP Team members who were in attendance at the IEP team meetings of April 24, 2013 and May 21, 2013.

The District argues that it did not fail to offer Student a FAPE, and that it is entitled to complete its triennial psychoeducational and behavior assessments of Student absent parental consent and without parentally-imposed conditions or restrictions.

1.      Failure to complete psychoeducational and behavioral assessments

Plaintiffs contend that the District denied Student a FAPE by failing to complete the psychoeducational and behavioral assessments, as agreed in the May 2010

1    Settlement Agreement and the November 15, 2010 Assessment Plan.

2        Plaintiffs assert that the District's failure to conduct the agreed-upon assessments

3    constituted a breach of the Settlement Agreement.  They argue that it was incumbent on

4    the District to set a time, place, and date for the assessments, and that the District's

5    refusal to allow Mother to fully "participate" in the assessments by seeing and hearing

6    them was unreasonable because Mother made clear that she would do nothing to alter

7    the testing environment.  They contend that the District's claim that Parents would not

8    have produced Student for the assessments was "pure speculation."

9        They assert further that the District's refusal to permit Mother to see and hear the

10   assessment was unlawful, in that it violated  34 C.F.R. § 300.501(b)(1) ("The parents of a

11   child with a disability must be afforded an opportunity to participate in meetings with

12   respect to . . . [t]he identification, evaluation, and educational placement of the child.").

13   Finally, they contend that the California Department of Education permits parents to fully

14   observe (see and hear) the administration of assessments at its state-funded Diagnostic

15   Centers, which they believe supports their position that Mother's demand was

16   reasonable.

17       The ALJ found that Student failed to meet his burden on this issue.  AR 1641-42.

18   The ALJ found that the assessments were not completed because Parents did not permit

19   the District to complete them, and did not otherwise make Student available for the

20   assessments without the parentally-imposed condition that Mother be allowed to see and

21   hear the assessments.  AR 1630, 1632, 1641.  The ALJ found further that Student had

22   failed to establish that the District violated any law or legal obligation to Student or

23   Parents by refusing to allow Mother the ability to observe the District's assessment of

24   Student.  AR 1630-31.

25       The ALJ found that the evidence showed that District had denied Parents' request

26   to observe the assessment due to its concerns about test validity and integrity, its long-

27   standing policy and procedures for assessments, and overall concerns that the testing

28   environment would be altered by Mother's presence, which might then affect the validity

United States District Court
Northern District of California

1   of the assessment results.  AR 1631.  Conversely, the ALJ found that Student had not

2   shown that the District's position, policy, and practices were either unreasonable or

3   unlawful.  AR 1631.

4       In ruling that the District could conduct the assessments, the ALJ specifically

5   concluded that the demand to observe the assessments amounted to imposition of

6   improper conditions or restrictions on the assessments, as to which the District had no

7   obligation to accept or accommodate.  AR 1632.  In addition, the ALJ found that the

8   District had met its burden of showing that it was entitled to complete its triennial

9   assessments of Student absent parental consent and without parentally imposed

10  conditions or restrictions.  AR 1634-35.

11      The court agrees with the decision below.  The District did not deny Student a

12  FAPE by failing to complete the psychoeducational and behavior assessments, because

13  Parents would not consent to the assessments.  The record shows that Parents made it

14  clear to the District that they would not produce Student for the assessments unless the

15  District gave in to their demand that Mother be allowed to fully observe (see and hear)

16  the administration of the assessments.

17      The court finds that parents' condition that they be allowed to see and hear the

18  assessment was unreasonable, and they effectively withdrew their consent by insisting

19  on that condition.  The ALJ accurately concluded that the District's failure to complete the

20  required assessments was caused by Parents' interference and denial of consent, and

21  that the request to observe the assessment amounted to the imposition of improper

22  conditions or restrictions on the assessments, which the District had no obligation to

23  accept or accommodate.

24      At the due process hearing, the only reason that Mother could articulate for

25  wanting to observe the assessments was to ensure "the integrity" of the assessments'

26  results.  By contrast, the District established that it was a long-standing and well-

27  supported District policy and procedure to preclude parental observation of assessments,

28  and that its policy was based on concerns that the observation might alter the testing

United States District Court
Northern District of California

environment and affect the validity of the assessments' results.

Plaintiffs have provided no legal authority granting them the right to observe either the psychoeducational or behavior assessment, and likewise provided no evidence that the District violated any law or obligation by refusing to allow Mother to observe the assessments. The regulation cited by plaintiffs is to no effect here, as it mandates only that parents be afforded an opportunity to participate in meetings "with respect to" assignments. See 34 C.F.R. § 300.510. It does not impose a requirement that parents be allowed to participate in the actual assessments or evaluations of students, as plaintiffs claim. Moreover, the references to Student's Mother being permitted to observe assessments by another assessor (and the references to the practice at the Diagnostic Center) are not relevant to the issue whether the District is legally required to permit Parents to see and hear every assessment it conducts.

Finally, plaintiffs' argument that Mother never refused to produce her son and that the District is speculating when it claims that she would not have produced him is specifically contradicted by the record. As detailed above, Dr. Jourdan sent Dr. Habash an e-mail on January 9, 2013, stating that she wanted to arrange a time to assess Student and offering the dates of January 14 or 16, 2013. That same day, Dr. Habash responded, but ignored the proposed dates and made clear that she would agree to schedule the assessment only if the District accepted her condition: "I will be willing to wait outside as long as you use a one-sided mirrored room, where I can observe (see and hear) my child being tested. Please let me know when you find such an arrangement in proximity to our hometown. We will be able to continue our scheduling from there." Dr. Jourdan reasonably interpreted this e-mail to mean that Dr. Habash would make Student available for assessments only if her condition was met.

Subsequently, on February 11, 2013, the District sent an e-mail advising Dr. Habash that if she did not contact Dr. Jourdan by February 15, 2013, to set up the remainder of Student's testing schedule, the District would assume that Dr. Habash did not intend to allow the District to conduct any further assessments of Student. Based on

1    this, Dr. Habash's silence clearly communicated to the District that she was refusing to

2    produce Student for the assessments.

3           Plaintiffs' argument that the District should have set a time and date for the

4    assessments in the hope that Student would show up is illogical, as there is no evidence

5    indicating that Parents were ever willing to produce Student.  Parents made no effort to

6    schedule the assessments despite the District's numerous attempts, and they made it

7    clear that they would not produce Student unless the District met their demand.  Dr.

8    Jourdan initially provided proposed dates, but instead of accepting one of the dates or

9    proposing alternative ones, Dr. Habash stated that scheduling could continue only after

10   the District agreed to her condition.

11          In an effort to compromise, the District offered Dr. Habash the opportunity to

12   watch, but not hear, the assessments through a one-way mirror (even though no such

13   requirement was imposed by law), and even repeated this offer numerous times in letters

14   and e-mails.  However, Dr. Habash repeatedly ignored the District's communications, and

15   refused to contact Dr. Jourdan to set up a time to complete the assessments.  For this

16   reason, it would have been pointless to unilaterally schedule assessments and reserve

17   people's time and other resources when completion was unlikely.

18          Thus, the ALJ reasonably found that "Parents inappropriately refused to allow [the]

19   District to complete its triennial assessments."  The ALJ ordered that the District shall "be

20   allowed to conduct its assessments of Student in all areas of suspected disability,"

21   without interference.

22          The court finds further that the District has met its burden of showing it was

23   entitled to complete its triennial assessments of Student absent parental consent and

24   without parentally-imposed conditions or restrictions.  The evidence shows that at all

25   times, the District was attempting to complete Student's assessments to provide him with

26   the special education services to which he is entitled.

27          A school district is required to conduct a reevaluation if it "determines that the

28   educational or related services needs, including improved academic achievement and

24

United States District Court
Northern District of California

1  functional performance, of the child warrant a reevaluation." 20 U.S.C § 1414(a)(2)(A)(i),

2  Cal. Educ. Code § 56381(a).  Such reassessments must occur at least once every three

3  years unless the parents and the school district agree that a reevaluation is not

4  necessary.  20 U.S.C § 1414(a)(2)(B), Cal. Educ. Code § 56381(a)(2).

5  In the present case, Student had not been evaluated since 2008.  Per the

6  Settlement Agreement, the District and Parents agreed to extend the three-year period

7  and allow the District to reevaluate Student in 2013 instead of 2011.  Thus, in 2013, five

8  years after the District's last assessments, a reevaluation was necessary for the District

9  to make accurate determinations regarding Student's current educational placement and

10  needed special education services.  Furthermore, both the Settlement Agreement and

11  the Assessment Plan show that the District was entitled to complete the assessments.

12  While it is true that Parents did not sign the Assessment Plan, the ALJ was correct in

13  finding that the District could move forward with the assessments because it was required

14  to conduct a triennial assessment.

15  The court finds that because the District has no obligation to accept or

16  accommodate Parents' demand to see and hear the assessments as they are

17  administered, there is no impediment to the District proceeding to complete both the

18  psychoeducational and behavior assessments without any parentally imposed conditions

19  and restrictions.

20  2.      Failure to offer placement in LRE

21  Plaintiffs assert that the District denied Student a FAPE by failing to offer

22  placement in the least restrictive environment ("LRE") when placement was offered at

23  Anova in the IEP Team meeting session in May 2013.  Plaintiffs contend that Anova was

24  not the LRE because all the students at Anova are disabled, with the majority on the

25  autism spectrum.  They argue that in such an environment, Student would be deprived of

26  contact with typically developing peers with whom he could learn to socialize.

27  The ALJ found that Student failed to meet his burden on this issue.  AR 1641.  The

28  evidence showed that the IEP Team discussed and considered various placement

1   options for Student, and determined that the District could not meet Student's needs in a

2   general education setting.  AR 1622-23.  Because Student had been in a home-school

3   program for three years, during which time he had not socialized with others outside his

4   home, and because of the concerns expressed by Student's mother, sister, and home-

5   school teacher about Student's sensitivity to noise, and also because of the large number

6   of goals included in his IEP, the Team concluded that a public school setting would not

7   be the optimal placement, at least during the period of time when Student would be

8   transitioning from the home-school environment.  AR 1623.  The ALJ found no evidence

9   that Student was ready for, or otherwise able to meaningfully participate in, a general

10   educational setting, with or without supplementary aids and supports, and that indeed,

11   Parents were requesting one-on-one placement in a single-student classroom.  AR 1624.

12         Analyzing the four factors in the least restrictive environment analysis, see

13   Sacramento City Unified Sch. Dist. v. Rachel H., 14 F.3d 1398, 1404 (9th Cir. 1984), the

14   ALJ concluded that Student would not benefit from general education or other public

15   school placement because his sensory issues would interfere with his ability to access

16   the curriculum and receive academic benefit; that there was no evidence that Student

17   would receive any non-academic or social benefits from full-time placement in a regular

18   education class, and neither party believed such placement would offer any non-

19   academic benefit to Student; that Student's presence might have a negative impact on

20   the other students in a general education setting, because Student is used to structured

21   learning environment, and becomes disruptive on occasions to express his disagreement

22   or displeasure or frustration; and that no evidence had been presented regarding the cost

23   of educating Student in a regular class classroom with appropriate services, as compared

24   to the cost of educating him in the District's proposed setting.  AR 1624-26.

25         The ALJ concluded that Anova was the LRE for Student, because its small-class

26   setting could meet Student's academic needs, and notwithstanding the lack of typically

27   developing peers, it could provide Student with educational benefit in the area of social

28   skills development, as he would have an opportunity to learn and practice his social skills

1    in a more naturalistic setting and with his peers at Anova.  AR 1626-29.  By contrast, the

2    ALJ found, the evidence did not show that Student would receive meaningful social

3    benefit from placement in a public school setting.  AR 1626-28.

4          The court agrees with the decision below.  The District did not deny Student a

5    FAPE by failing to offer him placement in the LRE.  Under the IDEA, school districts look

6    at a "continuum of services" to determine the best program to meet the individual

7    student's unique needs.  See Poolaw v. Bishop, 67 F.3d 830, 835 (9th Cir. 1995) (citing

8    34 C.F.R. §300.551(a)).  The question whether to educate a disabled child in a regular

9    classroom or in a special education environment is an individualized, fact-specific inquiry,

10   and the IDEA's preference for mainstreaming must be balanced against its requirements

11   that schools tailor programs to the specific needs of each disabled child.  Id. at 836; see

12   also J.W., 626 F.3d at 448.

13         The education of a disabled child should take place in the least restrictive

14   environment.  See 20 U.S.C. § 1412(a)(5)(A) ("To the maximum extent appropriate,

15   children with disabilities . . . are [to be] educated with children who are not disabled. . . .").

16   However, "[w]hile every effort is to be made to place a student in the least restrictive

17   environment, it must be the least restrictive environment which also meets the child's IEP

18   goals."  County of San Diego v. Cal. Special Educ. Hearing Office, 93 F.3d 1458, 1468

19   (9th Cir. 1996).  In determining whether an offered placement is the LRE, courts in the

20   Ninth Circuit consider the factors articulated in Rachel H.

21         Here, the evidence presented shows that Student would not benefit academically

22   from a general education or other public school placement, because his environmental

23   and sensory issues would interfere with his ability to access the curriculum.  Nor is there

24   any evidence that such a placement would offer any non-academic benefit to Student.

25   Moreover, there was evidence that until Student had achieved some facility with social

26   skills, his presence might have a negative impact on other students in a general

27   education setting.  See Rachel H., 14 F.3d at 1404.  The offered placement was in a

28   nonpublic school where Student would be educated in small classrooms and receive

1   specialized instruction, including social skills training.  Plaintiffs have presented no

2   evidence from the record from which the court could conclude that Anova is not the LRE.

3          While it is true that not all the assessments were completed as of the time of the

4   IEP Team meeting, the evidence presented at the due process hearing showed that

5   plaintiffs' preferred placement of one-on-one instruction by an ABA-trained teacher (in a

6   single-student classroom) with lunchtime socialization with volunteer "lunch bunch" of

7   typically developing peers, see AR 1339-40, 1624, 3346, 4022-24, 4317-19, and possible

8   future gradual exposure to typically developing peers, would be significantly more

9   restrictive than the placement offered at Anova, as it would constitute an isolated one-on-

10  one environment where Student would remain all day with his teacher, seeing other

11  students only during a brief lunch period.[2]

12         As noted above, from 2010 until the time of the IEP meeting, plaintiff had been

13  educated at home, in isolation, with his mother, his teacher, and occasionally his sister as

14  his social contacts.  His teacher Ms. Riehle testified that he was taken out only about four

15  times in three years.  AR 2948-51.  Ms. Brown, the District's Program Specialist, who has

16  attended over 550 IEPs, testified that the one-on-one instruction proposed by Dr. Habash

17  was more restrictive than Anova because it would restrict Student from the peer

18  interaction that takes place within the classroom, and he would be separated from his

19  peers.  AR 4318-19.  Similarly, Dr. Jourdan testified that the one-on-one environment

20  would prevent him from working on social skills through interaction with other people.  AR

21  1918-19.  Ms. Ogar, the speech therapist, testified that Student could not achieve speech

22  goals with only occasional peer interaction.  AR 3645-46.  Accordingly, because Student

23  would not receive the benefit of regular social skills training and would have his speech

24  goals hindered, plaintiffs' desired placement cannot be considered the LRE.

25         Dr. Habash and Student's home-school teacher Ms. Riehle generally agreed that

26  full-time placement in a general education classroom would not be the proper placement

27  _____

28  [2]  Moreover, plaintiffs failed to show that it would be feasible to implement a program of lunchtime socialization by a group of ABA-trained student "volunteers."

for several reasons.  Dr. Habash stated that Student was very sensitive to noise and crowds and that he could not be in a classroom with lots of other children.  AR 1622, 1339, 4354.  Both Ms. Riehle and Ms. Isono agreed with Dr. Habash that noise was a concern.  AR 1622, 1339, 3028.  Ms. Riehle even noted that she would have to warn Student of impending noise such as the sharping of a pencil.  AR 1621, 1338.

Members of the team also had a serious concern regarding Student's ability to transition from a home based program to a public school campus considering Student's individual goals and the services needed.  AR 1624, 1339, 1919, 3731-32.  Ms. Riehle noted that a general education setting would be challenging due to all the different service providers.  AR 1622, 1339.  In addition, plaintiff's older sister testified that she did not think that Student would be ready for a general education placement for one or two years.  AR 1339.  Based on this, the District contends that mainstreaming in a general education setting was never considered a viable option.

The evidence shows that the placement at Anova would address the concerns regarding Student's noise sensitivity, his inability to be in a class with numerous students, and the difficulty he may have transitioning out of a home-based program, in that Anova provides a small and controlled environment and structure with classes of no more than seven to nine students.  AR 2638.  In addition, all teachers at Anova are trained in ABA, which satisfies Mother's demand in that regard.  AR 2640, 2658-59, 4033, 4212.

"[T]he IDEA accords educators discretion to select from various methods for meeting the individualized needs of a student, provided those practices are reasonably calculated to provide him with educational benefit.'"  R.P. v. Prescott Unified Sch. Dist., 631 F.3d 1117, 1122 (9th Cir. 2011)).  Under the circumstances, the fact that the District did not agree with Mother, and the fact that the District felt that the placement at Anova was the best place for Student, at least for the period following the April/May 2013 IEP Team meeting sessions, does not amount to a denial of a FAPE.

            3.      Improper predetermination of placement

Plaintiffs contend that the offer of placement at Anova was "predetermined" and

1   thus resulted in denial of a FAPE.  They assert that the "consensus" of the IEP team was

2   for placement in Student's own classroom with a one-to-one ABA trained teacher; that

3   the offer of Anova preceded the completion of the IEP; that the District did not know if

4   Anova would take Student at the time the offer was made; and that no representative of

5   Anova was present at the IEP meeting, as required under 34 C.F.R. § 300.325.

6           The ALJ found that Student failed to meet his burden on this issue.  AR 1640.  The

7   ALJ found no evidence that the District had decided on its offer prior to the IEP meeting,

8   and to the contrary, found that the District had complied with the procedures set forth in

9   the IDEA, particularly with regard to providing Parents with an opportunity to fully and

10  meaningfully participate in Student's IEP meeting.  AR 1629, 1640.  Moreover, the ALJ

11  found, the evidence showed that all of Student's IEP Team members participated and

12  were able to express their views and make recommendations, and there was no

13  evidence that the District failed to consider the recommendations of the Team members

14  who had knowledge of Student.  AR 1629-30, 1640.  The ALJ added that the fact that the

15  District did not offer the placement that Parents wanted did not mean that the District had

16  predetermined Student's placement.  AR 1630.

17          The court agrees with the decision below.  "Predetermination occurs when an

18  educational agency has made a determination prior to the IEP meeting, including when it

19  presents one educational placement option at the meeting and is unwilling to consider

20  other alternatives."  Z.F. v. Ripon Unified School Dist., 2013 WL 127662, at *6 (E.D. Cal.

21  2013) (citation omitted).  A school district may not arrive at an IEP team meeting with a

22  "take it or leave it" offer.  J.G. v. Douglas County School Dist., 552 F.3d 786, 801, n.10

23  (9th Cir. 2008); Z.F., 2013 WL 127662, at *6.  "Courts in [the Ninth] Circuit have rarely

24  found that a school district's predetermining a student's IEP rises to the level of a

25  redressable violation of the IDEA procedures."  Z.F., 2013 WL 127662 at *6.

26          With regard to plaintiffs' claim that placement at Anova was contrary to the Team

27  "consensus" that Student belonged in a general education full-inclusion environment with

28  special services and typically developing peers, this misrepresents the record, as there

United States District Court
Northern District of California

1   was no consensus that Student would be best served by isolating him in his own

2   classroom with a one-to-one teacher as plaintiffs proposed.  Indeed, the evidence shows

3   that most of the IEP Team was against a one-on-one placement.  It appears to have

4   been Mother alone who requested the isolated one-on-one instruction for most of the

5   school day, with a social/lunch group during the lunch break.  AR 1339-40, 1624, 3346,

6   4022-24, 4047-48, 4317.  Members of the Team criticized this option, as Student had for

7   three years been isolated in a home program and needed to move into an environment

8   where he could work on social skills with peers.  See, e.g., AR 4046-47 (Ms. Anderson).

9        For example, Ms. Brown, the District's Program Specialist, testified that the one-

10  on-one approach is "restricting [Student] from being provided the peer interaction that

11  takes place in a classroom, and you're separated from the rest of the kids."  AR 4318-19.

12  She opined that Parents' recommendation of a lunch time socialization program (with

13  "volunteer" ABA-trained students) was not sufficient because overall it was a very

14  restrictive placement.  AR 4319.  She also noted that a one-on-one placement on a public

15  school campus would be a noisy environment – something that Student's Mother

16  acknowledged was problematic.  AR 4319, 4354.

17       The school psychologist, Dr. Jourdan, expressed that it was critical for Student to

18  work on his social skills and interact with other people as part of his educational program,

19  and she explained that "the critical areas are developing his social skills and him learning

20  how to interact with other people.  I think direct teaching of these skills is important, but I

21  also think you need to be having the exposure with other people to learn social skills

22  instead of just learning those skills in isolation."  AR 1918-19.  She was clear in her

23  opinion that placement on a public school campus was not appropriate.  AR 1919.

24       The speech pathologist, Ms. Ogar, testified that Student needed to be in a

25  classroom with other students to achieve his speech goals, and that she did not think that

26  having one-on-one instruction with occasional peer interactions would be sufficient.  AR

27  3645-46.  The District's Director of Special Education, Ms. Anderson, testified that she

28  had the support of the team – with the exception of Student's Mother – when Anova was

United States District Court
Northern District of California

1    specifically suggested.  AR 4040-47.

2        Second, with regard to whether the offer of placement preceded the completion of

3    the IEP and the development of goals, the evidence shows that the Anova was properly

4    offered and discussed.  Predetermination involves the question whether the school

5    district is exhibiting a "take it or leave it" position with the parents and refusing to consider

6    options and have open discussions with the team.  Here, the record reflects that a

7    substantial period of time was spent discussing Student's program, with participation by

8    Mother.  AR 1338-40, 1915-17, 3331, 3484-86, 3640, 4021-27, 4304-07, 4353-54.  The

9    IEP meeting was convened over two days.  In fact, the meeting was adjourned and

10   reconvened so that the entire team could review the extensive reports prepared by

11   Mother and his teacher.  AR 902-50, 1336-67.

12       Plaintiffs assert that the draft goals were not appropriate, although they cite no

13   support for this claim.  They also contend that the draft goals were set too high and still

14   required revision, citing testimony by Ms. Anderson, who recalled discussion at the IEP

15   meeting about "modifying the goals so that these things would be at [Student]'s reading

16   level."  Ms. Anderson also testified, however, that the general consensus was that the

17   goals required some revision, or "tweaking," but with some input from Ms. Riehle; but that

18   before the placement was offered, when Ms. Brown had a conversation with Ms. Riehle

19   asking for her input, Ms. Riehle offered no input, so there was no revision.  AR 4188-92.

20       As for plaintiffs' contention that the offer was predetermined because the District

21   did not know if Anova would take Student, and no Anova representative was present at

22   the IEP meeting as required under 34 C.F.R. § 300.325, this assertion does not support a

23   finding of predetermination, as not having a representative from the school at the IEP

24   meeting would support the conclusion that no decision regarding placement had been

25   made in advance of the meeting.  Further, a careful reading of the regulation shows that

26   where a representative of the nonpublic school cannot be present at the IEP meeting, the

27   agency can ensure full participation in other ways.  See 34 C.F.R. § 300.325(a)(2).

28       Here, there was no procedural violation that amounted to a denial of FAPE.  After

1   making the offer, the District arranged for Parents to meet with Anova personnel so that

2   any questions or concerns could be addressed.  Parents visited Anova on July 18, 2013.

3   AR 4028-31; 4056; 2680-81.  Mr. Bailey (Anova's Director), Ms. Anderson, and Parents

4   all met to discuss the program at which time Parents were able to ask questions (which

5   they did) and visit several elementary and secondary classes. AR 4028-29; 4056-58;

6   2681.  In total, Parents spent approximately two hours at Anova, at which point Mr. Bailey

7   advised that the next step would be to review records and meet Student.  AR 2680-82;

8   4056; 4059.  However, there is no evidence that Parents ever made arrangements for

9   Student to come visit the school  AR 2682; 4059.

10  Even where there is a technical procedural violation of the IDEA such as the

11  absence of an IEP team member, this alone will not result in a denial of FAPE; there

12  must be the loss of educational opportunity or serious infringement on a parent's

13  participation.  See W.G. v. Board of Trustees of Target Range Sch. Dist. No. 23, 960

14  F.2d 1479, 1484 (9th Cir. 1992), superceded by statute on other grounds, 20 U.S.C.

15  § 1414(d)(1)(B).

16  Here, it is clear from the record that the placement decision was not presented to

17  Parents without any consideration of their opinions and input on the matter.  Rather, there

18  is substantial evidence in the record of an interactive and dynamic process between the

19  parents and the various IEP team members regarding multiple topics, including several

20  options for placement.

21  In particular, the evidence shows that Parents had the opportunity to meaningfully

22  participate in the IEP process.  Parents were provided with the information to be

23  discussed at the meetings, including the goals, assessment reports, and meeting

24  agendas.  AR 1528-30, 3294, 3317, 4012-14.  During both meetings, Dr. Habash was

25  able to ask questions of team members, raise concerns, discuss goals, and present her

26  own progress reports.  AR 1336-37, 1920-21, 2973, 3297-98, 3327-29, 3622, and 3983.

27  In addition to considering Dr. Habash's input, the District considered the

28  information presented by the other IEP team members.  AR at 1336-40.  For example, at

33

both meetings, Ms. Riehle, Student's in-home teacher, was given the opportunity to present her reports regarding Student's in-home school program and his progress.  AR 1337-39, 2973-74, 4016.  She also provided the team with recommendations regarding placement, services, and accommodations for Student.  AR 1339, 2977, 4273.

Likewise, Ms. Ogar, the SL assessor, and Ms. Isono, the OT assessor, presented their findings, contributed to the team discussions, and helped develop Plaintiff's IEP.  AR 1336, 1338-39, 3621.  Ms. Ogar testified that the discussion of the goals drove the discussion regarding placement and that the team discussed where those goals and services could be best met.  AR 3628.  Student's sister also presented her observations during the second IEP meeting.  AR 1339-40.

Plaintiffs cite to no evidence showing that the District did not consider all of the information available including the substantial reports presented during the two lengthy IEP meetings.  Accordingly, the court finds that the ALJ correctly determined that the District's placement decision was not predetermined, and upholds his decision on that issue.  Not all procedural irregularities deny a child a FAPE; rather, a child is denied a FAPE when "procedural inadequacies . . . result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process." R.B., 496 F.3d at 938; W.G., 960 F.2d at 1484.  Under that standard, plaintiffs have not established that the District denied Student a FAPE.

## CONCLUSION

In accordance with the foregoing, the District's motion is GRANTED and plaintiffs' motion is DENIED.  The court AFFIRMS the decision of the ALJ on all issues raised in the appeal.

**IT IS SO ORDERED.**

Dated:  August 17, 2015

_____
PHYLLIS J. HAMILTON
United States District Judge

United States District Court
Northern District of California